UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

HFGL LTD. and CNH CAPITAL
EUROPE LTD.,

    Plaintiffs,

    v.

ALEX LYON & SON SALES
MANAGERS AND AUCTIONEERS,
INC.,

    Defendant.

HONORABLE JOSEPH E. IRENAS

Civil Action No. 06-4746
(JEI/AMD)

**OPINION**

**APPEARANCES:**

MOSES & SINGER LLP
By:  Philippe Alain Zimmerman, Esq.
2200 Fletcher Avenue
Fort Lee, NJ 07024
    Counsel for Plaintiffs

HELLRING LINDEMAN GOLDSTEIN & SIEGAL LLP
By:  Matthew E. Moloshok, Esq.
    Richard B. Honig, Esq.
One Gateway Center
Newark, NJ 07102-5386

    and

NOTTINGHAM, ENGEL & KERR LLP
By:  Richard L. Engel, Esq.
One Lincoln Center, Suite 600
Syracuse, New York 13202
    Counsel for Defendant

**IRENAS**, Senior District Judge:

    This case involves a dispute arising out of Defendant Alex

Lyon & Son Sales Managers and Auctioneers, Inc.'s ("ALS") sale at

auction of construction equipment allegedly owned by Plaintiffs HFGL Ltd. and CNH Capital Europe Ltd. (collectively "HFGL and CNH"). HFGL and CNH presently move for summary judgment. For the reasons that follow, their Motion will be denied.[1]

## I.

This case stems from Plaintiffs HFGL and CNH and Defendant ALS's business dealings with a third-party English corporation, Thornycroft 1862 Co. Ltd., and its affiliated companies (collectively "Thornycroft").[2] In 2006, when Thornycroft went into administration, the English law equivalent of bankruptcy, HFGL and CNH discovered that Thornycroft had engaged in various deceptive activities. (Samson Aff. ¶ 12.) In summary, HFGL and CNH allege that Thornycroft smuggled construction equipment that rightfully belonged to HFGL and CNH from England to the United States. HFGL and CNH further allege that after the equipment arrived in the United States, Thornycroft provided the equipment to auctioneer ALS to sell at auction. (Pl. Br. at 4.) ALS sold

_____

[1] The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332. Plaintiffs are incorporated in England and Defendant is incorporated in New York. The amount in controversy is more than $75,000.

[2] Plaintiffs and Defendant provide different accounts as to Thornycroft's business. ALS asserts that Thornycroft was a construction equipment dealer. (Lyon Aff. ¶ 31.) In contrast, HFGL and CNH assert they did not believe Thornycroft was a dealer (Reply Br. at 7.) Instead, they believed that Thornycroft was a "Major Earth Contractor" and that it was also involved in "Quarry and Aggregate Work," and "Engineering/Manufacturing". (Samson Aff. ¶ 6.) HFGL and CNH also thought that Thornycroft was involved in a deal to provide construction services on a major housing development. (Pl. Reply 56.1 Stmt. ¶ 20.)

the equipment, and HFGL and CNH did not receive any of the proceeds.  (Pl. Rule 56.1 Stmt. ¶ 10, 13-14.)

The record is replete with numerous inconsistencies and conflicts, as well as material issues of disputed fact.  Although the factual background remains murky, the Court has pieced together a narrative.  A detailed factual account follows.

*ALS' Business Arrangement with Thornycroft*

Defendant ALS is an American corporation that conducts auctions of construction equipment across the United States. (Lyon Aff. 4-5.)  In 2004, Thornycroft, in the guise of an internationally well-connected dealer of construction equipment, and ALS entered into a "handshake deal" for ALS to auction equipment that Thornycroft would ship from England.[3]  (Lyon Dep. at 45:11-46:8, Jun. 11 2008.)

In accordance with their handshake deal, ALS and Thornycroft entered into the following business arrangement.   ALS paid Thornycroft monetary advances, expecting to be repaid from the

---

[3]   This "handshake deal" was not memorialized in a formal written agreement.  Furthermore, although ALS typically had its consignors sign a consignment agreement guaranteeing that they would only provide ALS with equipment that was free of liens and encumbrances, Thornycroft did not sign such an agreement. Nonetheless, ALS continued to do business with Thornycroft. Doing business without a signed consignment agreement was not unusual for ALS, as the corporation often waived the consignment agreement requirement for its larger customers. (Zimmerman Aff. Ex. 4.)

auction proceeds.  (Lyon Aff. ¶ 13.)  For its part, Thornycroft
sent ALS descriptions of the "packages"[4] of equipment it intended
to ship to ALS to auction.  In its letters, Thornycroft detailed
which items of equipment would be included in the packages, but
did not provide serial numbers for the items.  Thornycroft would
then ship the packages to the United States and have them
delivered directly to the auction.  Upon receipt of the packages,
however, ALS often discovered that Thornycroft had sent different
items than it had promised.  (Zimmerman Aff. Ex. 5.)  Despite
such discrepancies, ALS nonetheless auctioned the equipment that
Thornycroft had supplied.  Operating under this model, ALS sold
equipment provided by Thornycroft at multiple auctions.  (Lyon
Aff. ¶ 14.)  This relationship continued until 2006 when
Thornycroft entered administration.  At that time, Thornycroft
owed ALS approximately $1.8 million dollars for advance payments
that ALS had made.  (Lyon Aff. ¶ 13.)


*HFGL and CNH's Business Arrangement with Thornycroft*

Plantiffs HFGL and CNH are English corporations in the
business of purchasing tangible property, including construction
equipment, and then leasing it to third-parties.[5]  (Samson Aff. ¶

---

[4] "Package" is the industry term for a selection of
equipment.  (Lyon Aff. ¶ 12.)

[5] Additionally, HFGL and CNH are United Kingdom-based
affiliates of BNP Paribas.

4

2.)  Rather than lease equipment they already have in stock like a car dealership, it appears that HFGL and CNH purchase individual items as needed to execute particular leasing deals. (Lyon Aff. Exs. D, J.)  ALS alleges that Plaintiffs' business should be characterized as financing items, including equipment, for customers. (Lyon Aff. ¶ 20.)

In 2005, HFGL and CNH began a business relationship with Thornycroft.  HFGL and CNH entered into more than 50 hire purchase agreements with Thornycroft.[6]  In the instant motion, HFGL and CNH bring claims concerning the following nine items of equipment listed in the chart below (the "Equipment").[7]

─────────────────

[6]  HFGL and CNH entered into the contracts individually. The contracts at issue in this case are either between HFGL and Thornycroft or CNH and Thornycroft.

[7]  The Court notes that HFGL and CNH allege that ALS auctioned off two more pieces of Equipment in their Summary Judgment Motion than they allege in their Amended Complaint.  In their Motion, HFGL and CNH allege for the first time that ALS auctioned Case 330 Serial No. 455152 and Case 330 Serial No. 455161, and, accordingly, are liable for conversion for the sale of these two items.  HFGL and CNH's allegations regarding these items are wholly confined to their filings in support of their summary judgment motion.  (*Compare* Pl. Br. at 4 *with* Am. Compl. at 2 ¶¶ 7-8.)  Plaintiffs cannot amend their pleadings in a summary judgment motion.  *See Tavernas v. Resorts Int'l Hotel, Inc.,* No. 07-4555, 2008 WL 4372791, at *6, n.7 (D.N.J. Sept. 19, 2008) (Plaintiff "may not amend a complaint through her briefs to the Court."); *Gilmour v. Gates, McDonald & Co.,* 382 F.3d 1312, 1315 (11th Cir. 2004) ("At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed. R. Civ. P. 15(a).").  Furthermore, HFGL and CNH have already amended their Complaint, but did not use that opportunity to add allegations regarding Case 330 Serial No. 455152 and Case 330 Serial No. 455161. Accordingly, for the purpose of the instant motion, the Court

| Asset Make | Model | Serial No. |
|------------|-------|-----------|
| Komatsu | PC130-6 | K31967 |
| Terex | TA40 | A7771352 |
| Terex | TA30 | A8281122 |
| Terex | TA40 | A7771273 |
| Caterpillar | 980 GII | AXG00383 |
| Case | CX28 | 301220 |
| Case | CX28 | 301300 |
| Case | CX28 | 301299 |
| Case | CX28 | 300852 |

These items were the subject of certain hire purchase agreements between Plaintiffs and Thornycroft (the "Hire Purchase Agreements"). The Hire Purchase Agreements pertain to one or more particular pieces of construction equipment. They describe the item or items by make, model and serial number. (Samson Aff. Exs. 1-9.) The Hire Purchase Agreements are all form contracts that share the same contractual provisions, including a choice-of-law provision, stating that the agreements are "governed by English law." (*See, e.g.,* Samson Aff. Ex. 1 § 13.5.)

HFGL and CNH assert that pursuant to the Hire Purchase Agreements, HFGL and CNH agreed to lease construction equipment to Thornycroft in return for a certain number of monthly rental payments. (Samson Aff. ¶ 8.) The Hire Purchase Agreements

will disregard any allegations pertaining to 330 Serial No. 455152 and Case 330 Serial No. 455161.

provided that the equipment belonged to Plaintiffs; however, the equipment could belong to Thornycroft, if it paid all its rental payments, exercised its option to purchase the equipment, and paid an additional "Option to Purchase Fee." (Samson Aff. ¶ 9; Ex. 1 § 9.)  HFGL and CNH argue that these contracts should be considered the English law equivalent of lease agreements. However, ALS disputes Plaintiffs' characterization of its business model in general, and the Hire Purchase Agreements in particular.  ALS alleges that Plaintiffs' business model should be characterized as financing, rather than leasing, items for customers. (Lyon Aff. ¶ 20.)  ALS also claims that HFGL and CNH's arrangement with Thornycroft should be properly seen as HFGL and CNH's providing Thornycroft with acquisition financing.  (Lyon Aff. ¶ 19.)

HFGL and CNH allege that Thornycroft did not make its required rental payments, did not it exercise its option to acquire ownership of the Equipment, and did not make the additional payment necessary to acquire the Equipment.  (Samson Aff. ¶ 11.)  Accordingly, HFGL and CNH assert they own the Equipment pursuant to the Hire Purchase Agreements.

### *Transport and Sale of the Equipment*

HFGL and CNH assert that, despite the Equipment rightfully belonging to Plaintiffs, Thornycroft smuggled the Equipment from

England to the United States, violating its contractual

obligations.[8]  Once the Equipment arrived in the United States,

HFGL and CNH allege that Thornycroft provided the Equipment to

ALS.  Plaintiffs allege that ALS then auctioned the Equipment on

Thornycroft's behalf at auctions in Texas, Florida, New York, New

Jersey, and Connecticut.[9]  (Pl. 56.1 Stmt. ¶ 11.)  ALS does not

dispute that it auctioned the Equipment, but asserts, however,

that it didn't know that HFGL and CNH had claims to the

Equipment.  HFGL and CNH were unaware of the sales until after

they were completed and did not authorize them.  (Pl. 56.1 Stmt.

¶¶ 14-15.)  It is undisputed that ALS did not provide the

_____

[8]  The agreements provide that Thornycroft "must not hold
itself out as the owner of the Equipment or do anything to that
might jeopardise HFGL's [or CNH's] interest in the Equipment";
Thornycroft must "keep the Equipment in its possession at all
times"; and Thornycroft "will not use the Equipment outside the
United Kingdom, or if the Equipment is a vehicle [Thornycroft]
will not use it outside Western Europe for a period or periods
exceeding an aggregate of 28 days in any year, without prior
written consent of HFGL [or CNH]."  (*See, e.g.,* Samson Aff. Ex. 1
§§ 4.1, 4.3.)

[9]  HFGL and CNH have submitted inconsistent evidence
regarding the auction dates for the Equipment items.  For
example, Plaintiffs have submitted evidence suggesting that Terex
TA40 A7771352's auction occurred on January 30, 2005 (Samson Aff.
Ex. 13; Pl. 56.1 Stmt. ¶ 11), but have also submitted evidence
indicating it took place on February 3, 2005 (Zimmerman Aff. Ex.
10 at 3), as well as evidence that it took place on February 5,
2006 (Zimmerman Aff. Ex. 10 at 1).  HFGL and CNH have also put
forth inconsistent material regarding the location the Terex TA40
A7771273's auction.  Although HFGL and CNH assert that the Terex
TA40 A7771273 was sold in an auction that occurred in Monticello,
New York, they have also submitted evidence indicating that the
item was auctioned in Ledyard, Connecticut. (*Compare* Pl. 56.1
Stmt. ¶ 11 *with* Samson Ex. 13 at 2.)

proceeds or benefits to HFGL or CNH.  (Pl. 56.1 Stmt. ¶ 16.)

Despite the apparent clarity of HFGL and CNH's allegations, the details surrounding Thornycroft's acquisition of the Equipment and the Equipment's shipment to the United States remain murky.  Transporting construction equipment from England to the United States can be a lengthy process.  (Lyon Aff. ¶ 24; Zimmerman Aff. Ex. 3.)  Nonetheless, five items of the Equipment were auctioned in the United States only several days after their respective Hire Purchase Agreements were executed.  For example, ALS asserts that the Hire Purchase Agreement for the Terex TA30 A8281122 was executed on February 2, 2006, but the item was sold three days later in Florida.[10]  (Lyon Aff. ¶ 24.)  ALS alleges that the Terex TA30 A8281122 could not have been successfully transported and gone through customs' quarantine in three days, and so, could not have been in England when the agreement was executed.[11]  (*Id.*)  In addition, Plaintiffs have submitted

---

[10]   The Court notes that HFGH and CNH have submitted documents providing conflicting auction dates for Terex TA30 A8281122.  HFGH and CNH's Rule 56.1 Statement lists the date as January 30, 2005, while Exhibit 13 to Nigel Samson's affidavit has the auction as occurring on February 5, 2006.

[11]   In addition to the Terex TA30 A8281122, the following items listed in the Amended Complaint were also auctioned in the United States mere days after the Hire Purchase Agreements pertaining to them were executed. The Hire Purchase Agreements for the Case CX28 301220, Case CX28 301300, Case CX28 301299, and Case CX28 300852 were all executed on September 22, 2006. (Samson Aff. Ex. 6-9.) According to HFGL and CNH's 56.1 Statement, the items were all auctioned two days later on September 24, 2005.  (Pl. 56.1 Stmt. ¶ 11.)  Further complicating

evidence that suggests that HFGL signed the Hire Purchase agreements regarding the Terex TA40 A7771352 and Terex TA40 A7771273 approximately two months before the items were sold in the United States.[12]  As Lyon has stated that shipping construction equipment to the United States can take up to four months, the timing may raise questions.  (*See* Lyon Dep. 51:2-24.)

Furthermore, another Equipment item, the Caterpillar 980 GII AXG00383 ("Caterpillar 980"), was actually sold at auction almost a year <u>before</u> HGFL and CNH executed their Hire Purchase Agreement pertaining to the item.  (Pl. 56.1 Stmt. ¶ 11; Samson Aff. Ex. 5; Lyon Aff. ¶ 21.)  Additionally, ALS alleges that one piece of Equipment, the Komatsu PC130-6 Serial No. K31967 ("Komatsu PC130-6"), was not provided to ALS by Thornycroft, but rather by U Brothers, a different equipment company.  (Zimmerman Aff. Ex. 7.) No explanation has been provided as to how U Brothers may have obtained the item.  As HFGL and CNH did not visit the purported location of the Equipment before executing the Agreements, nor

---

matters, other documents on the record state that those auctions occurred on September 23, 2005, or, in the case of Case CX28 300852, October 8, 2005. (Samson Aff. Ex. 13.)  Either way, the auctions occurred a fairly short time after the agreements' execution.

[12]  Hire Purchase Agreement for the Terex TA40 A7771352 was executed on December 1, 2004 (Samson Aff. Ex. 2), and Plaintiffs' 56.1 Statement asserts that the auction occurred on January 30, 2005.  (Pl. 56.1 Stmt ¶ 11.)  Similarly, the Hire Purchase Agreement for the Terex TA40 A7771273 was executed on April 20, 2005 (Samson Aff. Ex. 4), and Plaintiffs' 56.1 Statement asserts that the auction occurred on June 4, 2005.  (Pl. 56.1 Stmt ¶ 11.)

did they inspect the Equipment, there is no record of when the
Equipment was actually located in England or when it was
physically removed.  (Pl. Reply 56.1 Stmt. ¶¶ 11, 17.)

This suit followed.  The Amended Complaint asserts four
causes of action against ALS, asserting that (1) ALS is liable
for conversion because it wrongfully sold equipment belonging to
HFGL; (2) ALS is liable for conversion, because it wrongfully
sold equipment belonging to CNH; (3) ALS was unjustly enriched as
a result of benefits received from the wrongful sale of HFGL's
equipment; and (4) ALS was unjustly enriched as a result of
benefits received from the wrongful sale of CNH's equipment.[13]
HFGL and CNH presently move for summary judgment.  For the
reasons explained herein, HFGL and CNH's motion will be denied.


## II.

"Under Rule 56(c), summary judgment is proper 'if the
pleadings, depositions, answers to interrogatories, and
admissions on file, together with the affidavits, if any, show
that there is no genuine issue as to any material fact and that
the moving party is entitled to a judgment as a matter of law.'"
*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed.

---

[13]  Although Plaintiffs have styled their Amended Complaint
as bringing only four causes of action, practically speaking,
however, they will have to prove their conversion and unjust
enrichment claims as to each of the nine items of Equipment to be
successful in their suit.

11

R. Civ. P. 56(c)).  An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  A fact is "material" if a dispute about the fact "might affect the outcome of the suit under the governing law." *Id.*  In deciding a motion for summary judgment, the Court must construe the facts and inferences in a light most favorable to the nonmoving party. *Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323.  "'With respect to an issue on which the nonmoving party bears the burden of proof, the burden on the moving party may be discharged by 'showing'— that is, pointing out to the district court— that there is an absence of evidence to support the nonmoving party's case.'" *Conoshenti v. Pub. Serv. Elec. & Gas*, 364 F.3d 135, 145-46 (3d Cir. 2004) (quoting *Celotex*, 477 U.S. at 325).  The role of the Court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249.

### III.

HFGL and CNH seek summary judgment on their claims that ALS

12

auctioned Equipment belonging to them without their consent and is therefore liable for conversion[14] and subsequent unjust enrichment.  The Court will first address the unjust enrichment claims, and then turn to the conversion claims.

**A.**

In their Motion, HFGL and CNH only mention their unjust enrichment claims once.  (Pl. Br. at 6.)  Despite the fact that HFGL and CNH bear the burdens of proof and persuasion, they do not provide case law or argument in direct support of these claims.  Plaintiffs do not set out the elements of unjust enrichment, nor do they specify which states' law applies.  As HFGL and CNH have not satisfied their summary judgment burden, the Court will deny summary judgment as to Plaintiffs' unjust enrichment claims.

**B.**

HFGL and CNH's conversion claims are premised on the assertion that they are the owners of the Equipment pursuant to Hire Purchase Agreements under English Law.  HFGL and CNH bear the burden of demonstrating the absence of any genuine issue of material fact as to their claims.  *Celotex Corp.*, 477 U.S. at 323.  ALS contends that HFGL and CNH's threshold claim of ownership is undermined by multiple genuine issues of material

---

[14]  In their motion, HFGL and CNH treat Count I and II as if they were one joint claim for conversion.  The Court will follow suit.

fact.  The issue is, who owned the equipment when ALS sold it at auction?  In order to prevail on their summary judgment motion, HFGL and CNH must establish that a reasonable factfinder could only conclude that they owned the equipment.  But before reaching that merits issue, a choice of law analysis is necessary.

### 1.

The parties dispute which law should determine HFGL and CNH's rights under the Hire Purchase Agreements.  HFGL and CNH argue that English law should govern HFGL and CNH's rights under the Hire Purchase Agreements.  In contrast, ALS asserts that the agreements should be interpreted under some form of American law.

In a diversity case, the Court applies the choice of law rules of the forum state - in this case, New Jersey.  *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).  New Jersey employs a flexible "governmental-interest" test to decide choice-of-law questions.  *Fu v. Fu*, 160 N.J. 108, 118 (1999).  New Jersey follows a two-step analysis.  First, the Court must determine whether there is actually "a conflict between the potentially applicable bodies of law. Where there is no difference between the laws of the forum state and those of the foreign jurisdiction, there is a 'false conflict' and the [C]ourt need not decide the choice of law issue." *Lucker Mfg. v. Home Ins. Co.*, 23 F.3d 808, 813 (3d Cir. 1994) (internal citations omitted).

14

A true conflict exists here, because the prevailing laws of England and the law of the States diverge on whether an owner retains title and ownership in property that is the subject of a hire purchase agreement.  In English law, there is a clear, formalistic distinction between a sale and a hire purchase or lease.  *See* Gerald McCormack, *Secured Credit Under English and American Law* 52-53 (2004).  Under English law, a hire purchase agreement is viewed as a "lease with an option to purchase provided at the end of the term of the lease."[15]  (Davies Report ¶ 5.)  Unless the option is exercised, the lessor retains ownership of the goods.  (Davies Report ¶ 5-6.)

In contrast, generally speaking, the American approach is to conduct a fact-intensive inquiry to determine whether an agreement in the form of a lease should properly be considered a security interest or installment contract, rather than a lease. Under U.C.C. § 1-203(a), "[w]hether a transaction in the form of a lease creates a lease or a security interest is determined by the facts of each case."  U.C.C. § 1-203(a); *see also,* U.C.C. § 1-203(b) (setting out the factors used to determine whether an agreement is a security interest)*.*  Under this approach, "the

---

[15]  The Court considers Professor Iwan Davies' expert report on the English Law of hire purchase agreements ("Davies Report") pursuant to Fed. R. Civ. P. 44.1 and consistent with its Opinion denying ALS' motion to strike the Davies Report.  *See  HFGL Ltd. v. Alex Lyon & Son Sales Managers and Auctioneers, Inc.*, 264 F.R.D. 146 (D.N.J. 2009).

essential distinction between a true lease and a conditional sale is that in a lease, the lessee never owns the property . . . . Where the purported lease is really a conditional sale agreement, the lessor holds only a security interest in the goods and has no other rights in the goods." 79 C.J.S. *Secured Transactions* § 23; *see also,* U.C.C. § 1-203 cmt. 2. As an actual conflict exists, the Court turns to the next step of the analysis.

"Ordinarily, when parties to a contract have agreed to be governed by the laws of a particular state, New Jersey will uphold the contractual choice if it does not violate New Jersey's public policy." *Homa v. American Express Co*., 558 F.3d 225, 227 (3d Cir. 2009) (quoting *Instructional Sys., Inc. v. Computer Curriculum Corp.,* 130 N.J. 324, 342 (1992)) (emphasis omitted). Under this analysis, a contractual choice-of-law provision will be enforced  unless either:

> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or
>
> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which * * * would be the state of the applicable law in the absence of an effective choice of law by the parties.

*Instructional Systems*, 130 N.J. at 342 (quoting *Restatement (Second) Conflict of Laws* § 187). HFGL and CNH assert that England has the greatest interest in resolving the issue of ownership pursuant to the Hire Purchase Agreements and therefore

16

English law should apply.  ALS has not disputed that England
bears a substantial relationship to the parties of transaction.
Further, although ALS has argued that the American fact-intensive
approach is generally preferable to the English formalistic
approach, ALS has not argued that the application of English law
would violate a fundamental policy of an American state with a
materially greater interest in the matter than England.
Moreover, it is apparent that England has a strong interest in
the matter, as the contracts are between English corporations
regarding equipment that the contracts stipulate will be located
in the United Kingdom.  Accordingly, the Court finds that English
law should apply to the issue of whether HFGL and CNH own the
Equipment pursuant to the Hire Purchase Agreements.[16]

**2.**

As previously stated, under English law, a hire purchase
agreement is viewed as a "lease with an option to purchase
provided at the end of the term of the lease."[17] (Davies Report ¶

---

[16]  ALS contends that if the Court applies English law, it
must follow England's choice of law determination that ownership
of an item should be governed by the law of the country where the
transaction concerning that item took place.  In support of this
proposition, ALS looks to the English case, *Winkworth v.
Christie, Manson & Woods Ltd.*, [1980] 1 Ch 496, which held that
the ownership of an item stolen from England and then purchased
in Italy would be governed by Italian law.  However, as the Court
applies the English law of hire purchase agreements, not choice
of law rules, this case is inapposite.

[17]  The Court relies on Professor Iwan Davies' expert report
on the English Law of hire purchase agreements ("Davies Report")

5.)  If the hirer/lessee has fulfilled his obligations under the lease, he may then exercise the option to purchase by making an additional payment.  (Davies Report ¶ 5.)  Pursuant to the agreement, unless the hirer/lessee has exercised his option, he cannot dispose of the goods and the property remains the owners. McCormack, *supra,* at 52-53.  This remains true even if the hirer/lessee has possession of the goods.  (Davies Report ¶ 5-6.) These rules are based on the principal of *nemo dat quod (qui) non habet*, meaning, one cannot transfer what one does not have.[18] (Davies Report ¶ 8.)

HFGL and CNH argue that because Thornycroft did not exercise its option to purchase the equipment, nor make the final payment required to obtain the equipment, HFGL and CNH retained ownership of the Equipment pursuant to the Hire Purchase Agreements.  ALS disputes HFGL and CNH's claim of ownership.  Among other

pursuant to Fed. R. Civ. P. 44.1 and consistent with its opinion denying ALS' motion to strike the Davies Report.  *See HFGL Ltd. v. Alex Lyon & Son Sales Managers and Auctioneers, Inc.,* No. 06-4746, 2009 WL 5171856 (D.N.J. Dec. 22, 2009).

[18]  ALS contends that the application of English law of hire purchase is too arbitrary and fact-intensive for the Court to apply it to the instant case.  To support its contention, ALS points to *Forthright Finance Ltd. v. Carlyle Finance Ltd.,* [1997] 4 All ER 90, which held that a contract with a negative option labeled a "hire purchase" agreement, was in fact a disguised conditional sale agreement.  *Forthright*, however, has little applicability to the instant case.  Unlike the agreements at issue, the *Forthright* contract contained a negative option and, as ALS points out, another English court has declined to extend *Forthright*'s reasoning.

18

arguments, ALS alleges that the Hire Purchase Agreements did not reflect the reality of how the goods came into Thornycroft's possession.  Instead, ALS argues, Thornycroft acquired at least some of the Equipment as a result of transactions that preceded the Hire Purchase Agreements.  Thornycroft, subsequently, defrauded HFGL and CNH, persuading them to "acquire" equipment for Thornycroft that Thornycroft already possessed, or, in the case of the Caterpillar 980, had already sold to another buyer. ALS contends therefore HFGL and CNH did not actually ever acquire any interest in at least some of the Equipment.

The Court now examines whether a reasonable factfinder could decide that, subsequent to Thornycroft's fraud, HFGL and CNH did not properly acquire any interest in at least some items of the Equipment.  The Court first examines the transfer and auction of the Caterpillar 980, then the Komatsu PC130-6, and finally a group of items of Equipment that were auctioned shortly after HFGL and CNH executed their corresponding Hire Purchase Agreements.

Genuine issues of material fact exist as to whether HFGL and CNH owned the Caterpillar 980.  ALS auctioned the Caterpillar 980 on Thornycroft's behalf on May 21, 2005 in the United States. (Pl. 56.1 Stmt. ¶ 11, Def. 56.1 Stmt. ¶ 26.)  Almost a year later,  HFGL and CNH and Thornycroft executed a Hire Purchase

Agreement for the exact item, the Caterpillar 980.  (Samson Aff. Ex. 5.)  ALS argues that HFGL and CNH cannot have any rights to the Caterpillar 980, as it was acquired and then sold by Thornycroft long before HFGL and CNH entered into an agreement concerning the item.  In response, HFGL and CNH submit that they succeeded to the prior owner's rights to the Caterpillar 980 after it was auctioned.  Although HFGL and CNH assert that they ultimately purchased the Caterpillar 980 from its prior owner, they provide no factual support for this claim.  Thus, issues of material fact exist regarding whether HFGL and CNH had ownership rights to the Caterpillar 980.[19]

The record also raises genuine issues of material fact regarding ownership and sale of the Komatsu PC130-6.  HFGL and CNH allege that "Thornycroft smuggled the Equipment [including the Komatsu PC130-6] and delivered it to AL&S [sic] to be auctioned in the United States."  (Pl. Br. at 4.)  HFGL and CNH further assert that ALS then auctioned the equipment in Dallas, Texas for $74,500.  (Pl. Br. at 5.)  However, these assertions are contradicted by the factual record, which contains evidence suggesting that Thornycroft did not directly deliver the Komatsu PC130-6 to ALS and that ALS did not auction the item on the

_____

[19]   In the alternative, HFGL and CNH ask the Court to grant summary judgment on all items of Equipment except for the Caterpillar 980.  In light of the multiple disputed material issues of fact in this case, the Court declines to do so.

behalf of Thornycroft.  According to ALS President Jack Lyon, the
equipment company U Brothers, not Thornycroft, provided the
Komatsu PC130-6 to ALS.  (Zimmerman Aff. Ex. 7.) Further, Lyon
claims that ALS auctioned the Komatsu PC130-6 on U Brothers'
behalf, not Thornycroft's.  (*Id*.)  Additionally, a computer
record submitted by HFGL and CNH lists U Brothers, rather than
Thornycroft, as the seller of the Komatsu PC130-6.[20]  (Zimmerman
Aff. Ex. 8.)  A reasonable factfinder could find that U Brothers,
rather than Thornycroft, delivered the Komatsu PC130-6 to ALS and
that ALS sold it on U Brother's behalf.

Although HFGL and CNH were evidently aware that ALS
claimed it did not receive the Komatsu PC130-6 directly from
Thornycroft, they have not acknowledged this evidence in their
briefings, nor addressed how it affects their theory of the
item's ownership.  A reasonable factfinder could find that
Thornycroft deceived HFGL and U Brothers was the true owner of

---

[20]  The record also contains factual discrepancies regarding
the auction of the Komatsu PC130-6.  The Amended Complaint
asserts that Komatsu PC130-6 was sold "in or about 2005," but a
computer record introduced by HFGL and CNH suggests that the
auction took place on or around September 27, 2004, because the
check for the sale was sent on that date.  (Am. Compl. at ¶ 13;
Zimmerman Aff. Ex. 8.)  Further confusing the matter, HFGL and
CNH's Summary Judgment Motion includes a table providing the
auction date for all of the Equipment except the Komatsu PC130-6.
Similarly, the Amended Complaint states that the Komatsu PC130-6
was sold for $78,000, while the brief in support of the Summary
Judgment Motion, as well as Plaintiffs' Rule 56.1 Statement
assert that it was sold for $74,500.  (Am. Compl. ¶ 13; Pl. Br.
at 5; Pl. 56.1 Stmt. ¶ 11.)

the Komatsu PC130-6, rather than HFGL and CNH.  A genuine
material dispute exists as to whether HFGL and CNH owned the
Komatsu PC130-6 and whether there were subsequent transactions
that affected the rights of HFGL, CNH, and ALS regarding the
Komatsu PC130-6.

Finally, a reasonable factfinder could determine that at
least seven additional Equipment items were brought to the United
States before their corresponding Hire Purchase Agreements were
executed, further raising questions as to the actual ownership of
those items.  Record evidence indicates that the Terex TA30
A8281122, Case CX28 301220, Case CX28 301300, Case CX28 301299,
and Case CX28 300852 were auctioned only a few days after their
agreements were signed.  (Samson Aff. Ex. 6-9.)  Furthermore, the
record suggests that ALS auctioned the Terex TA40 A7771352 and
Terex TA40 A7771273 approximately two months after their
agreements were signed.  The timing of these the auctions and the
Hire Purchase Agreements' executions raises questions as to when
Thornycroft acquired the items and whether Thornycroft shipped
them to the United States before the Hire Purchase Agreements
were signed.  A reasonable factfinder could find that Thornycroft
independently obtained this equipment, delivered it to the United

States, and only then entered into sham agreements with HFGL and CNH, thus undermining HFGL and CNH's theory of the case.[21]

For the reasons discussed above, HFGL and CNH have failed to sustain their summary judgment burden with regard to the threshold issue of ownership, and therefore, cannot prevail on their conversion claims.  There are disputed issues of material fact with regard to all nine items of Equipment.  Accordingly, summary judgment will be denied as to the conversion claims.[22]

_____

[21]  ALS makes a number of additional arguments in opposition to HFGL and CNH's motion; however, as the Court is denying summary judgment motion for the reasons discussed, it declines to address these arguments.

[22]  Even if HFGL and CNH could show that they were indisputably the owners of HFGL and CNH, other material issues of disputed fact would remain with regard to their conversion claims.  The parties agree that the question of conversion should be governed by the law of the States.  However, HFGL and CNH fail both to specify which states' law should apply and to set out the elements of conversion.  Instead, HFGL and CNH merely assert that they meet the "purported elements of conversion" that ALS had identified as common to the law of conversion in each of the states where an auction occurred.  (Reply Br. at 4.)  HFGL and CNH bear the burden of proving that ALS converted each item of Equipment and should not rely on elements of conversion that they assert are merely "purported."

Additionally, if HFGL and CNH were to make out the elements of conversion, there would still be issues with regard to ALS' liability.  The bulk of HFGL and CNH's argument relies on the principle that an auctioneer who sells property on behalf of a title-less principal is strictly liable for conversion to the item's true owner.  See, e.g., Parker v. P&N Recovery of New York, Inc., 182 Misc.2d 342, 346 (Civ. Ct. N.Y. 1999).  Although conversion jurisprudence varies from state to state, the majority view is that an auctioneer is held strictly liable to an item's true owner "in the absence of facts creating an estoppel or showing acquiescence or consent on the part of the true owner or

23

**IV.**

For the reasons stated above, HFGL and CNH's Motion for Summary Judgment will be denied.  The Court will issue an appropriate Order.


Dated: March 25, 2010


 s/ Joseph E. Irenas

**JOSEPH E. IRENAS, S.U.S.D.J.**

---

mortgagee." 96 American Law Reports 2d 208; *see also*, *Parker*, 182 Misc.2d at 346 ("auctioneer would not be liable to the true owner if it can be said that the true owner constructively or expressly consented to, or acquiesced in, the sale of the property, or otherwise engaged in negligent or intentional conduct which misled the principal.").

ALS argues that Plaintiffs acquiesced in the sale, because they knew or should have known that Thornycroft was a dealer and were negligent in protecting their investment.  Plaintiffs contend that Thornycroft did not enter into the Hire Purchase Agreements as a dealer.  Both sides point to record evidence. Thus, an issue of disputed fact exists as to whether Plaintiffs acquiesced to the auctions.